UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| INTERLOGIC OUTSOURCING, INC., IOI PAYROLL SERVICES, INC., IOI WEST, INC., LAKEVIEW HOLDINGS, INC., LAKEVIEW TECHNOLOGY, INC., MODEARN, INC., and TIMEPLUS SYSTEMS LLC, | Case No. 19-31445-hcd (Jointly Administered) |
| Debtors. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING BIDDING
AND SALE PROCEDURES AND RESERVATION OF RIGHTS**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases (the "Chapter 11 Cases") of Interlogic Outsourcing, Inc., *et al.* (the "Debtors"),

by and through the Committee's undersigned proposed counsel, hereby objects (the "Objection")

to *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Scheduling*

*the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, and*

*(IV) Granting Related Relief* (Doc. No. 139, the "Bid Procedures Motion").  In support of its

Objection, the Committee states as follows:

**PRELIMINARY STATEMENT**

1.     By the Bid Procedures Motion, Debtors seek approval of certain Bidding

Procedures,[1] which contemplate an expedited sale process (30 days from approval of the Bidding

Procedures to the Sale Hearing) in compliance with the express terms of the Debtors' DIP Credit

Agreement, for the sole benefit of Debtors' pre-petition Lender, KeyBank National Association

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bid Procedures Motion.

CO\6232186.13

("Lender" or "KeyBank").  Approval of the Bidding Procedures in their current form will almost certainly chill bidding and could result in no recovery to the unsecured creditors.

2.      Pre-petition, Huron Transaction Advisory ("Huron") purportedly reached out to "28 potential strategic and financial buyers."  *See* Bid Procedures Motion, at p. 3. Post-bankruptcy, Huron purportedly contacted over 70 potential buyers; however, only 10 of those parties have shown any interest.  This limited "reach out" was not sufficiently robust or designed to prime the market for an expedited post-petition sale.  Further, these parties have had little if no opportunity to review diligence, and as such, all diligence activities will need to be conducted as part of the post-petition sale process.  All parties deserve to have sufficient time to review the data room and for further diligence, especially the parties that will be contacted for the first time.

3.      The Bid Procedures Motion does not provide any real or meaningful justification as to why the sale process must proceed so quickly or how the rapid pace will facilitate a competitive sale process.  Rather, the Bid Procedures Motion simply states that the short time-line is needed to comport with the milestones set in connection with the debtor-in-possession facility ("DIP Facility") provided by KeyBank.  KeyBank, in its capacity as DIP Lender or pre-petition Lender, should not be permitted to control these Chapter 11 Cases for its own benefit. Moreover, Debtors and KeyBank must disclose whether KeyBank intends to credit bid, because potential purchasers may have no interest in conducting due diligence or submitting bids if that is the case.  The expedited timeline, combined with the specter of a credit bid and unknown stalking horse protections will necessarily chill bidding.

4.      As proposed, the Bidding Procedures will likely result in sale proceeds less than the alleged secured debt, leaving nothing for general unsecured creditors.  While the Committee and its professionals are moving quickly to get their arms around these Chapter 11 Cases (and

within one business day of its formation, has already requested information from the Debtors to assess the bid process and interest in it), the Committee was formed only three days after the Debtors filed their Bid Procedures Motion and five days before the hearing thereon. The Committee and its professionals are working expeditiously to analyze the Debtors' business, operations, and financial condition, and the circumstances leading up to these Chapter 11 Cases. These efforts should not be constrained by the unreasonable deadlines imposed by KeyBank, which appears to be controlling the Chapter 11 Cases solely for KeyBank's own benefit.

5.      As discussed more fully below, the Committee has several concerns with respect to the Bid Protections and Bidding Procedures. In particular, the proposed Bidding Procedures must be significantly modified in order to create a fair and open process. As detailed herein, the proposed Bidding Procedures:

   a.      Impose an artificial and arbitrary bid deadline for third parties to submit qualifying bids. The entire sale process must be expanded by at least four weeks, to give all potential bidders an opportunity to submit meaningful bids for the Debtors' assets.

   b.      Improperly permit KeyBank to credit bid. KeyBank or any other alleged secured party should be precluded from credit bidding unless and until the Committee has had sufficient time to investigate, and validate, any alleged secured positions.

   c.      Improperly include KeyBank as an "Auction Consultation Party." Under no circumstances should KeyBank be a consultation party unless it is prohibited from being a bidder, because such would permit KeyBank to bid based upon "insider information."

   d.      Provides that "Any consultation rights of the Committee in these Bidding Procedures exist to the extent that, at the time of such proposed consultation, a Committee has been formed and has retained, or proposed to retain, counsel." *See* Bid Procedures, n.2. The Committee has formed and has retained counsel. As such, the Committee must be consulted throughout the sale process, must be a "notice party" and Auction Consultation Party, and should receive real time updates on the status of the proposed sale. The Committee should not be beholden to the Debtors for information, and it is inappropriate for the Debtors to serve as the gatekeeper of information.

3

e. Debtors essentially seek Court approval of a Stalking Horse Agreement as part of approval of the Bidding Procedures, without providing the parties, including the Committee, with an adequate opportunity to review and contest same. Ultimate approval of any Stalking Horse Agreement must wait until the Sale Hearing, with the Committee having an ample notice and opportunity to contest.

6. Moreover, the following limitations should be placed on any Stalking Horse Agreement and/or Purchase Agreement:

a. The Bid Protections should be capped at three percent of the cash portion of the contemplated sale. Any Bid Protections should be paid solely from the proceeds of an alternative transaction, without which, the Stalking Horse Bidder is entitled to no claim for the Bid Protections. Any credit or non-cash consideration should not be considered.

b. To the extent that the Stalking Horse Bidder or Successful Bidder is purchasing the Debtors' books and records associated with the Debtors' businesses ("Books and Records"), the Committee must be granted access to the Debtors' Books and Records post-closing. Access to the Books and Records is a necessary part to the Committee fulfilling its statutory and fiduciary duties. It must be clear that, notwithstanding any term to the contrary set forth in the Stalking Horse Agreement or Purchase Agreement, the Committee, and other fiduciaries to the Chapter 11 Cases, shall have complete access to any and all Books and Records during the pendency of these Chapter 11 Cases, as well as the reasonable cooperation of the Stalking Horse Bidder and its employees.

7. This Objection articulates the Committee's initial concerns with the Bidding Procedures, Stalking Horse Agreement, and Bid Protections, and reserves the right of the Committee to raise any and all additional objections prior to and at the Sale Hearing. The Committee respectfully requests that, unless the issues raised herein are adequately resolved, the Bid Procedures Motion be denied.

**BACKGROUND**

8. Prior to the Petition Dates, Debtor, Interlogic Outsourcing, Inc. ("IOI"), its principal, Najeeb Khan ("Khan"), and likely their affiliates, engaged in a check kiting and other schemes involving millions of dollars of customer funds, and may have diverted an equal or greater amount from IOI to Khan.

CO\6232186.13

9.      On July 8 or 9, 2019, KeyBank, with which IOI had a cash management and depository account agreement, discovered that checks issued by IOI, drawn on and paid out of IOI's KeyBank account, including a check for $90 million to Berkshire Bank, a check for $10 million to Wells Fargo, and a check for $22 million to JP Morgan Chase, collectively totaling more than $122 million ("Overdraft Exposure"), were dishonored because of insufficient funds, even though KeyBank had already wired the funds to the recipient banks ("Overdraft Event").

10.      Most, if not all, of the diverted funds were IOI customer deposits intended to be used by IOI to pay the customers' payroll and payroll taxes.  Although most of the payroll payments may have been made to the customers' employees, it appears that none of the payroll taxes were paid, in violation of IOI's agreement with its customers and applicable law.  The funds earmarked for payroll taxes were apparently diverted for Khan's benefit or for the benefit of one or more of the 29 other companies operated by Khan, and potentially others.

11.      Immediately following the Overdraft Event, KeyBank obtained a court order in the United States District Court for the Northern District of Ohio, freezing all assets held by IOI and Khan.  Thereafter, on July 12, 2019, KeyBank demanded that IOI grant KeyBank a security interest in all of IOI's assets to secure, among other things, KeyBank's unsecured prepetition liability resulting from the Overdraft Event.  IOI's submission to this demand is the first event in KeyBank's pattern of controlling the Debtors and muscling aside the unsecured creditors, whose tax deposits are ground zero in this massive fraud.

12.      On July 13, 2019, Khan appointed Timothy Daileader ("Daileader") as an "independent director" and as the sole manager of the Debtors.  On the same date, Daileader

5

caused the Debtors to retain Huron as financial advisor.  The next day, Daniel Wikel ("Wikel"), an employee of Huron, was appointed as Chief Restructuring Officer for the Debtors.[2]

13.     On July 19, 2019, IOI executed a Demand Promissory Note in favor of KeyBank in the amount of $1.4 million, ostensibly to finance IOI's continued operations in the near term. This new $1.4 million note was also secured by a security interest in all of IOI's assets.  With this financing in hand, IOI assured its customers that IOI would be conducting business as usual in an effort to prevent customers from terminating their relationships with IOI.

14.     Only three weeks later, on August 10 and 11, 2019 (the "Petition Dates"), the Debtors each filed voluntary petitions for relief under chapter 11 of the United States Code(as amended, the "Bankruptcy Code").  These Chapter 11 Cases are jointly administered, and no trustee or examiner has been appointed.

15.     The Debtors have not filed schedules and, as a result of an extension granted by the Court, the schedules are not due to be filed until Sept. 9, only one day prior to the Section 341 meeting.

16.     On August 22, 2019, the Committee was appointed. (Dkt. No. 148).

17.     On August 23, 2019, the Committee selected the undersigned counsel to represent the Committee.

### THE PROPOSED SALE

18.     On August 19, 2019, less than two weeks after the Petition Dates, the Debtors filed the instant Bid Procedures Motion.

19.     Debtors seek to begin a process of selling substantially all of their Assets (not specifically defined in the Bid Procedures Motion) in a manner that is almost at the direction of

---

[2] To date, the Committee has not yet been provided with a copy of Debtors' agreements with Huron or Wikel.

CO\6232186.13

and for the benefit of a single creditor, KeyBank, against whom the estates appear to have substantial claims and whose security interests are believed to be avoidable.  As proposed, the process is more "fire sale" than it is robust.

20.     The Bid Procedures Motion sets forth the following extremely short milestones:

a.  **September 2, 2019, at 4:00 p.m. ET** –Deadline for parties interested in serving as a Stalking Horse Bidder to submit non-binding indications of intent.

b.  **September 10, 2019, at 4:00 p.m. ET**  –Deadline for parties interested in serving as a Stalking Horse Bidder to submit a final binding proposal.

c.  **September 13, 2019, at 4:00 p.m. ET** – Deadline for submission of bids.

d.  **September 18, 2019, at 10:00 a.m. ET** – Date of auction, if needed.

e.  **September 19, 201 at 12:00 p.m. ET** – Deadline for Debtors to file and serve notice of Successful Bidder and amount of Successful Bid.

f.  **September 23, 2019 at 4:00 p.m. ET** – Deadline for objections to the sale.

g.  **September 26, 2019** – Sale Hearing.

21.     The proposed order approving the Bid Procedures Motion cedes to KeyBank domination over the sale process.  These dates and milestones are intertwined with the Debtors' DIP Facility with KeyBank, where failure to meet any of the above milestones constitute an event of default (Doc. No. 15).  Moreover, the Bid Procedures Motion and the proposed order attached thereto (the "Proposed Order") give KeyBank an extensive level of control over the sale process, including but not limited to giving KeyBank a veto with respect to numerous decisions involving the outcome of the sale, such as selection of the Successful Bidder.

22.     The Bid Procedures Motion was filed without a business plan, exit strategy, asset purchase agreement, potential purchaser, or Stalking Horse Bidder.  And there has not been the sort of robust marketing effort necessary to provide the maximum possible value to the estates and their creditors.

### OBJECTION

**I.     The Proposed Expedited Sale Timeline Benefits ONLY KeyBank to the Detriment of the Remaining Creditors of the Debtors' Estates.**

23.     The Debtors propose a bid deadline of September 13, 2019, such that the Debtors will only have 17 days at best to market the Debtors' assets.  Although the Debtors are pushing for a quick sale process to comply with the milestones of their DIP Credit Agreement with KeyBank, they fail to explain how, within only 17 days they plan to: (a) locate and qualify Potential Bidders and then Acceptable Bidders; and (b) permit such bidders to conduct due diligence and submit a bid that meets all requirements to qualify as a Qualified Bid, especially one acceptable to KeyBank.  There is simply no legitimate justification for such a truncated process.

24.     The Debtors bear the burden of demonstrating a sound business justification for a proposed sale.  See 11 U.S.C. § 363(b); NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (stating "the debtor in possession can sell property of the estate outside the ordinary course of business if: he has an "articulated business justification," he provides adequate notice to all creditors, and a hearing is held on the sale) (citation omitted); In re Efoora, Inc., 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) (citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983)).  Bankruptcy courts have viewed rushed sales promoted by a debtor and its lender with healthy skepticism.  See In re Fisker Auto. Holdings, Inc., 510 B.R. 55, 60–61 (Bankr. D. Del. 2014) (finding that a "rushed" sale hearing

8

several weeks after the petition date is inconsistent with the notions of fairness in the bankruptcy process").  The Supreme Court has cautioned that "[t]he need for expedition, however, is not a justification for abandoning proper standards." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 450 (1968).  Ultimately, approval of a sale rests with the bankruptcy court's discretion.  Efoora, 472 B.R. at 489 (citing Corporate Assets, Inc. v. Paloian, 368 F.3d 761, 767 (7th Cir.2004) and In re Irvin, 950 F.2d 1318, 1320 (7th Cir. 1991)).

25.    Here, the Debtors have put forth little more than a blanket assertion that the sale as proposed will be in the best interests of the estate.  And, there is little (if any) information in the record from which to evaluate the appropriateness of the Debtors' marketing and sale efforts.

26.    The Court and the Committee also have no indication as to the value of the Debtors' assets.  The Debtors' bankruptcy schedules have yet to be filed.  The Debtors have not proposed a business plan, exit strategy, purchase agreement, or even a potential purchaser.  And there has been no disclosure with respect to the Debtors' anticipated return that a sale on such short notice will provide to the estates, or whether there will be any funds available to unsecured creditors as a result of a sale.

27.    Yet, the Debtors are proposing a sale process that is almost entirely controlled by a single entity, KeyBank.  While the Bid Procedures Motion states that Debtors will "consult" with the Committee, it leaves almost all decisions at the direction of KeyBank, a creditor with liens that are likely subject to avoidance and that might itself be a significant source of recovery for the estate.

9

28.     Indeed, the Debtors must show that the creditors as a whole should benefit and whether the sale preserves the priorities among the creditors. See In re UAL Corp., 443 F.3d 565, 571–72 (7th Cir. 2006). Without the appropriate diligence this analysis will be incomplete.

29.     Further, the Committee was appointed after the Bid Procedures Motion was filed. While the Committee intends to be diligent and efficient in its investigation of the Debtors, Khan and his affiliates, and KeyBank, it cannot reasonably complete its investigation by the proposed time of the Sale Hearing.  This is at odds with the Interim DIP Order, which gives the Committee 90 days after entry of the order appointing Committee's counsel to investigate KeyBank and its purported liens. And because this sale is moving so quickly, the Committee will not have time to engage its own investment banker and truly determine whether the sale as proposed will maximize the value of the Debtors' assets or businesses.

30.     Courts have emphasized the importance of permitting creditors the opportunity to review prospective assets sales under section 363.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that the "import of Section 363 is that a trustee is prohibited from acting unilaterally; this schema is intended to protect both debtors and creditors (as well as trustees) by subjecting a trustee's actions to complete disclosure and review by the creditors of the estate and by the bankruptcy court" and that the "creditor body could suffer" if the review process is not fully informed). The needed review is not only to allow creditors the opportunity to appropriately weight in and to provide the checks and balance needed in such circumstances but also to supply information to the Court, who in turn determines the appropriate course of action to follow.  See LeCompte v. Sparks, No. 96 C 1373, 1997 WL 156488, at *11 (N.D. Ill. Apr. 1, 1997) (concluding "that, in circumstances when a settlement agreement provides for

10

disposition of a significant asset of the estate, the approach in *Martin* yields the most appropriate result[.]").

31.     When the Debtors availed themselves of this Court's jurisdiction by filing chapter 11 bankruptcy cases, the Debtors forfeited any right to enter in a purchase agreement without subjecting such sale to the scrutiny of juridical approval. See Conn-Selmer Inc. v. Bamber, No. 3:07-CV-100CAN, 2008 WL 348774, at *4 (N.D. Ind. Feb. 7, 2008).

32.     The Court, the Committee, and the Debtors' creditors are entitled to know that the proposed Bidding Procedures will actually maximize the value of the Debtors' assets.   The Committee therefore objects to the Bid Procedures Motion to the extent that it seeks to limit the rights of the Committee to seek information or oppose any or certain aspects of the sale and sale process, including the selection of a Stalking Horse Bidder, the appropriateness of Bid Protections, determinations as to who qualifies as a Qualified Bidder, the selection of a Successful Bidder, and the ultimate approval of a sale of the Debtors' assets.

## II.     Credit Bid Rights, if Any, Should NOT Be Allowed.

33.     The Bid Procedures Motion currently places no restrictions on KeyBank's potential right to credit bid.

34.     Bankruptcy courts can limit a creditor's right to credit bid for cause.  11 U.S.C. § 363(k).  A secured creditor's ability to credit bid is within the discretion of the court and is not absolute. *See also* In re N.J. Affordable Homes Corp., No. 05–60442(DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006) (noting that a bankruptcy court retains the authority to deny a secured creditor the ability to credit bid for "cause"); In re Theroux, 169 B.R. 498, 499 n. 3 (Bankr.D.R.I.1994) (holding that "there is no absolute entitlement to credit bid"). The term "cause" is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-

CO\6232186.13

case basis. In re N.J. Affordable Homes Corp., 2006 WL 2128624, at * 16 (finding that cause is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis"); In re River Road Hotel Partners, LLC, No. 09–30029(BWB), 2010 WL 6634603, at *1 (Bankr. N.D. Ill. Oct. 5, 2010) ("Section 363 gives courts the discretion to decide what constitutes 'cause' and the flexibility to fashion an appropriate remedy by conditioning credit bidding on a case-by-case basis."), aff'd sub nom. River Road Hotel Partners, LLC v. Amalgamated Bank, 651 F.3d 642 (7th Cir. 2011), aff'd sub nom. RadLAX Gatway Hotel LLC v. Amalgamated Bank, 566 U.S. 639 (2012).

35.      The Committee has only just begun to investigate the pre-petition fraud, the Debtors' transactions with KeyBank, and the validity of KeyBank's liens.  It is very likely that the Assets[3] subject to this sale may be entirely unencumbered (except as might be provided in the DIP Order).  As a result, KeyBank should not be entitled to credit bid in any sale proceeding. See Fisker Automotive, 510 B.R. at 61 (finding "no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien"); Nat'l Bank of Commerce of El Dorado v. McMullan (In re McMullan), 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) aff'd, 162 F.3d 1164 (8th Cir.1998) (creditor prohibited from credit bidding "because the validity of its liens and security interests are unresolved").  If this Court nonetheless permits KeyBank the right to credit bid, it should be required to provide some form of protection to the estate, such as a letter of credit, to prevent a release of potentially valuable estate claims. See, e.g., In re Octagon Roofing, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (bank allowed to credit bid conditioned upon the posting of an irrevocable letter of credit to protect the estate in the event the liens were later avoided); In re Daufuskie Island Props., LLC, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (holding

---

[3] Whatever those Assets may ultimately be.

that a creditor was not entitled to credit bid when its mortgage was in dispute); In re Olde Prairie

Block Owner, LLC, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011).

36.     The Committee objects to any credit bidding by KeyBank. KeyBank has been

involved with the Debtors prior to and since the Petition Date, is well-apprised as to the assets

and liabilities of the Debtors' business, and has been negotiating with the Debtors as to its role in

the restructuring and DIP Lender.  If KeyBank is ultimately the Stalking Horse Bidder, the Bid

Protections are not reasonably related to KeyBank's efforts and should therefore be denied.

**III.    Sale Proceeds Should Be Held in Reserve Pending Adjudication of KeyBank's Liens.**

37.     The Proposed Order suggests that the Assets will be sold free and clear liens and

interests, with said liens and interests attaching to the proceeds of sale, *subject to the stipulations,*

*terms, and conditions of the DIP Order*.  Given the questionable validity of KeyBank's liens and

the possible claims the estates may have against KeyBank, any and all proceeds of sale should be

held in reserve pending adjudication as to any rights thereto regardless of any agreement between

KeyBank and the Debtors, and a formal determination as to the estates' and/or Committee's rights

as to KeyBank.

**IV.    Additional Bidding Procedures Are Objectionable**.

38.     In addition to the concerns raised above, the Committee requests that any Order

approving the Bid Procedures Motion expressly reserve the Committee's right to raise

objections, prohibit KeyBank from credit bidding, and require the Debtors and Huron to disclose

to the Committee all information in its possession regarding the current state of the Debtors'

operations, the sale, the sale process, and the Debtors' assets, including:

a. Any information in the Debtors' possession regarding the value of the Debtors' assets, whether obtained by Huron, its other advisors, or otherwise;

b. All information currently in the Debtors' possession regarding the marketing and sale of the Debtors' assets, including all marketing efforts taken prepetition and to date, existing purchase offers, current potential buyers, and efforts made to secure a Stalking Horse Bidder;

c. Full access to the virtual data room set up by the Debtors' advisors; and

d. All other information that would reasonably permit the Committee to make a fully informed judgment regarding the proposed sale transaction.

39.    Further, the Bid Procedures should be modified consistent herewith, including:

a. Additional protections are needed for unsecured creditors who remain customers of the Debtors.  The Debtors' business performs operationally pivotal functions for many in the current unsecured creditor base.  Payroll processing is not the type of service an organization can find a new provider for overnight.  All bidders should be required to provide appropriate protections to existing customers in the event the sale contemplates a change or termination in the service the Debtors provide, including but not limited to notice of a possible disruption of service and a grace period for customers to transition should a transition be necessary.

b. Because of the extremely compressed timeline, Qualified Bidders should have access to due diligence past the bid deadline and through any auction;

c. The Bid Procedures Motion currently proposes to give parties one business day from the filing of a notice of Successful Bidder to object to the sale.

Parties should have up until the date of the Sale Hearing to evaluate the propriety of the sale and file or assert objections thereto; and

d.  Because of its proximity to the transaction, KeyBank should not be entitled to any Bid Protections should it be chosen as the Stalking Horse Bidder.

### CONCLUSION

For the reasons set forth above, the Committee objects to the Bid Procedures Motion and reserves the right to submit additional objections as additional information comes to light.


Dated:  August 26, 2019                              Respectfully submitted,

/s/ Jeffrey A. Hokanson
Jeffrey A. Hokanson
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: (317) 236-2100
Email: jeff.hokanson@icemiller.com

Louis T. DeLucia (admitted *pro hac vice*)
Alyson M. Fiedler (admitted *pro hac vice*)
ICE MILLER LLP
1500 Broadway, Suite 2900
New York, NY 10036
Telephone: (212) 835-6312
Email:  louis.delucia@icemiller.com
Telephone:  (212) 835-6315
Email:  alyson.fiedler@icemiller.com

R. William Jonas Jr.
HAMMERSCHMIDT, AMARAL &
JONAS P.C.
137 N. Michigan Street
South Bend, IN 46601
Telephone: (574) 400-8608
Email: jla@hajlaw.com

*Proposed Counsel for the Official*
*Committee of Unsecured Creditors*

15